*Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 6419 | **DATE** | 8/21/2001 |
| **CASE TITLE** | USA vs. Robert Bailey | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. It follows then that the "records of the case conclusively show that the prisoner is entitled to no relief" (Section 2255), for neither Bailey's conviction nor his sentence violated the Constitution. In the corresponding language of Section 2255 Rule 4(b), "it appears from the face of the motion...and the prior proceedings in the case that the movant is not entitled to relief in the district court." As stated at the outset, Bailey's motion is therefore dismissed summarily (id.). (1-1)

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | Document Number |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | AUG 2 2 2001 date docketed | |
| ✓ | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | FILED FOR DOCKETING 01 AUG 21 PM 4:19 | | |
| SN | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,      )
                               )
                Plaintiff,     )
                               )
        v.                     )    No. 01 C 6419
                               )        (98 CR 790)
                               )
ROBERT BAILEY,                 )
                               )
                Defendant.     )

MEMORANDUM OPINION AND ORDER

Robert Bailey ("Bailey") has filed a self-prepared 28 U.S.C. §2255[1] motion challenging his Hobbs Act (18 U.S.C. §1951[2]) conviction on constitutional grounds.[3] This Court finds that no evidentiary hearing is required because the issue raised by Bailey poses a pure question of law. That being the case, it is possible to address Bailey's motion now in accordance with Rule 4(b) of the Rules Governing Section 2255 Proceedings for the United States District Courts ("Section 2255 Rules"). For the reasons stated in this memorandum opinion and order, Bailey's

---

[1] All further references to Title 28's provisions will simply take the form "Section--."

[2] Because the Hobbs Act section number is so different from the numbering of the Title 28 sections that deal with post-conviction relief (all of those sections are in the 2250s), no confusion should be generated by citing the Hobbs Act provision as "Section 1951"--and this opinion will do so.

[3] Bailey's conviction and sentence were affirmed on direct appeal (227 F.3d 792 (7th Cir. 2000)). Because that affirmance came in September 2000, Bailey's current Section 2255 motion is timely under the first of the four alternative one-year periods of limitation specified in that section.

motion is dismissed summarily.

As background for that determination, photocopies of the indictment and of the government's "Version of the Offense" as included in Bailey's presentence investigation report are attached to this opinion. As to the former, it is self-explanatory. As to the latter, it is an accurate and fairly presented summary of the evidence at trial (because the jury's verdict found Bailey guilty of Count One, the Hobbs Act offense, and not guilty of Count Two, this opinion will focus on the portion of the summary that is relevant to the first count).

Based on those materials, Bailey's effort to invalidate his Section 1951 conviction on the strength of such cases as Jones v. United States, 529 U.S. 848 (2000) plainly cannot succeed. To be sure, a narrow majority of the Supreme Court--but still a majority--has in recent years issued a few opinions that have constricted the long-standing construction of the Commerce Clause that gave Congress sweeping power to criminalize activity under the auspices of that clause. But those decisions, beginning with United States v. Lopez, 514 U.S. 549 (1995), have not nearly reached the point now urged by Bailey.

Indeed, Jones itself simply rejected the notion that a private residence was "used in...any activity affecting... commerce," thus construing the federal criminalization of arson as extending only to buildings that fit that description.

Nothing in Jones even hinted at the invalidation of any conviction that would have the required connection to commerce--instead the Court said (529 U.S. at 859):

> We hold that the provision [18 U.S.C. §844(i)] covers only property currently used in commerce or in an activity affecting commerce.

By contrast, when it comes to the Hobbs Act, the circumstances of this case are startlingly parallel to those involved in United States v. Thomas, 159 F.3d 296 (7th Cir. 1998), and this Court sees no reason to believe that the analysis of the Hobbs Act in that case (id. at 297-98) is less valid today than it was then. Although Bailey seeks to cite United States v. Wang, 222 F.3d 234 (6th Cir. 2000) as standing for a more limited scope of application of Section 1951 that would not encompass his conduct, that contention overreads Wang. There the Sixth Circuit actually reconfirmed its position as to the breadth of the statutory compass ("To support a conviction under the Hobbs Act, we have required the government to demonstrate nothing more than a de minimis effect on interstate commerce" (id. at 237). Its ensuing determination that the robbery there bore an overly attenuated and speculative prospect of affecting such commerce (id. at 238-40 & n.1), so as not to reach even de minimis proportions, would not apply to Bailey for the very reasons that our Court of Appeals has set out in Thomas.

It follows then that the "records of the case conclusively

3

show that the prisoner is entitled to no relief" (Section 2255), for neither Bailey's conviction nor his sentence violated the Constitution. In the corresponding language of Section 2255 Rule 4(b), "it appears from the face of the motion...and the prior proceedings in the case that the movant is not entitled to relief in the district court." As stated at the outset, Bailey's motion is therefore dismissed summarily (id.).

_____
Milton I. Shadur
Senior United States District Judge

Date: August 21, 2001

UNTIED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 98CR 0790 |
| v. | ) | No._____ |
| | ) | Violations: Title 18, United |
| ROBERT BAILEY and | ) | States Code, Sections 924(c), |
| CHARLES JONES | ) | 1951 and 2. |

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

JUDGE SHADUR

MAGISTRATE JUDGE ROSEMOND

<u>COUNT ONE</u>

The SPECIAL APRIL 1998 GRAND JURY charges:

1. At all times material to this indictment:

    a. The Village of Maywood Park District operated and maintained a Park District Police Department ("the police department"). The officers employed by the police department were responsible for monitoring activities in and around the public parks of Maywood. Officers were not paid a salary in this position.

    b. The police department issued badges and identification cards to its officers identifying them as law enforcement personnel. Under Illinois law, the officers were considered "peace officers" and were permitted to carry concealed firearms.

    c. The police department maintained a general order requiring the inventory of property seized by its officers.

    d. Defendant ROBERT BAILEY was a cadet member of the police department.

    e. Defendant CHARLES JONES was a park district police officer and held the rank of lieutenant.

2. On or about January 25, 1996, at Maywood, in the Northern District of Illinois, Eastern Division,

ROBERT BAILEY and
CHARLES JONES,

defendants herein, did attempt to commit robbery, which robbery would have affected commerce, in that the defendants did, by use of actual and threatened force, violence, and fear, take approximately $1,200 in United States currency from the presence of an undercover law enforcement officer posing as a drug dealer;

In violation of Title 18, United States Code, Sections 1951 and 2.

## COUNT TWO

The SPECIAL APRIL 1998 GRAND JURY further charges:

On or about January 25, 1996, at Maywood, in the Northern District of Illinois, Eastern Division,

CHARLES JONES,

defendant herein, did knowingly use and carry a firearm during and in relation to the commission of a crime of violence, for which the defendant may be prosecuted in a court of the United States, namely, attempted robbery, in violation of Title 18, United States Code, Section 1951, as more fully set out in Count One of this indictment;

In violation of Title 18, United States Code, Sections 924(c) and 2.

## COUNT THREE

The SPECIAL APRIL 1998 GRAND JURY further charges:

On or about January 25, 1996, at Maywood, in the Northern District of Illinois, Eastern Division,

ROBERT BAILEY,

defendant herein, did knowingly use and carry a firearm during and in relation to the commission of a crime of violence, for which the defendant may be prosecuted in a court of the United States, namely attempted robbery, in violation of Title 18, United States Code, Section 1951, as more fully set out in Count One of this indictment;

In violation of Title 18, United States Code, Sections 924(c) and 2.

A TRUE BILL:

_____
F O R E P E R S O N


_____
UNITED STATES ATTORNEY

# Memorandum



| Subject | Date |
|---|---|
| Government's Version of the Offense <u>United States v. Robert Bailey</u>, No. 98 CR 791 | June 1, 1999 |

| To | From |
|---|---|
| Stephanie A. DeVoe<br>U.S. Probation Officer | Zaldwaynaka L. Scott<br>Assistant U.S. Attorney |

## I. MAXIMUM POTENTIAL PENALTIES

Defendant Robert Bailey was charged in a two count indictment with attempted robbery by extortion (Count One) and using and carrying a firearm during a crime of violence (Count Three) in violation of Title 18, United States Code, Sections 1951 and 924(c), respectively. A jury trial was conducted before the Honorable Milton I. Shadur. Defendant was convicted of attempted robbery and found not guilty of the firearms offense. The maximum potential penalties for the count of conviction are twenty years imprisonment, a $250,000 fine and a term of supervised release of not more than three years.

## II. GOVERNMENT'S VERSION OF THE OFFENSE

At all times relevant to the offense, defendant was a cadet member of the Maywood Park District Police Department. Defendant, like other officers, received no compensation in this position. It was the duty of park district police officers to patrol areas in and around various parks in the Village of Maywood. Park district officers were authorized by law to carry concealed weapons and make

1

arrests. Defendant was not authorized to carry a weapon because of his cadet status.

During the period defendant was active with the park district police department, he became involved in an illegal and corrupt activity known as "shakedowns." Shakedowns involved the robbery of money or drugs by park district officers from individuals involved in drug sales on the streets of Maywood. Defendant participated in shakedowns with officers that included his co-defendant Charles Jones and another officer named Michael Broome.

According to Jones, after meeting Bailey, he learned that Bailey was familiar with a number of the drug sale locations and individuals involved in drug dealing in Maywood. Bailey rode along with Jones approximately once a week on occasions when Jones was on duty. On at least three to four occasions Jones and Bailey took money from drug dealers which they split between themselves. On one occasion Jones took approximately $400 from a residence during the course of a search of that residence. He later split that money with defendant.

Bailey also told Jones about other occasions when he took money from people while working with other officers. These officers included Michael Broome. Broome has acknowledged his participation in shakedowns with officers that included Charles Jones and Robert Bailey.

According to Broome, sometime around Fall 1995, Bailey told him that he and Jones were involved in shakedowns. Bailey provided him with this information during a conversation Broome had with

Bailey inside of a park district squad car. Broome and Bailey then got involved in doing shakedowns together with other officers. At the time of the shakedowns money was taken from drug dealers and divided among the officers participating in the shakedown.

In December 1995, Broome was arrested by the Illinois State Police during an attempt by Broome to extort money from an individual. After his arrest, Broome agreed to cooperate with the Federal Bureau of Investigation in an investigation of corrupt activities by other park district officers. As part of his cooperation, Broome tape recorded conversations with Bailey and other officers.

Broome tape recorded a telephone conversation he had with Bailey on December 14, 1995. Earlier that day, Bailey advised Broome of a plan to set up a drug dealer named "Breeze" in order to steal Breeze's drugs and money. Broome reported this conversation to the FBI. During the tape recorded conversation, the two men discussed the set up of the drug dealer. (Transcript attached). Bailey assured Broome that they would get money or drugs during the shakedown. Bailey further advised Broome that the drug dealer sold cocaine. They also discussed possible methods they could use to steal the items.

On January 16, 1996, Broome tape recorded a conversation with other park district officers that included Bailey and Charles Jones. Part of this conversation took place inside the park district police department. (Transcript attached). During the conversation, Broome told the officers that he had two individuals

3

willing to provide him with drug information such as sources of drug. Broome explained that each individual was willing to part with the information because they owed him a favor. Brome stated that he let them go after catching them involved in some type of illegal activity. Broome advised that one of these individuals was going to set up his drug source for Broome so that Broome could steal money or drugs from the source. After listening to Broome, Bailey stated that he was interested in participating in the shakedown.

Later on January 16, Broome and Bailey had another conversation during which they discussed whether a particular officer could be trusted to keep quiet about their illegal activity. They also talked specifically about how the drug source would be set up for the robbery. Broome told Bailey that he did not know anyone who could rid of the cocaine for them if they recovered cocaine during the robbery. Bailey stated that he knew someone who would buy the cocaine from them.

On January 25, 1996, Broome told Bailey that the possible shakedown they discussed on January 16 was going to take place that day. He asked Bailey to get in contact with Charles Jones so that Jones could meet them at the police station. Jones was not on duty at the time but instead was working his regular employment as a animal control officer in Maywood. Bailey contacted Jones and Jones arrived at the parking lot of the station shortly thereafter. After he arrived at the station, Jones met with Broome in the rear parking lot. There the two men agreed to go to another location

4

near a park in Maywood. Bailey later met them at that location and entered a park district squad car being driven by Broome. Each of the three park district officers was carrying a firearm.

Broome advised them his source of information told him that the drug source would be parked in Bosco Park in Maywood and would be carrying either drugs or money with him. It was agreed that Broome and Bailey would pull up behind the drug source, detain him and search his person and his car. Jones was to arrive later and play the role of "back up." At the time Jones was driving a van owned by the animal control division of the Village of Maywood.

Broome and Bailey traveled to the park and pulled up behind the car. An undercover FBI agent was sitting in the car. A number of other agents were performing surveillance of the event at the time. Broome and Bailey both got out of the car. The undercover agent observed Bailey with a firearm in his hand as he approached the agent's car on the passenger side. The agent's attention was focused on Bailey because he knew Broome was cooperating with law enforcement in the investigation. Video tape and photographs taken at the time confirmed the agent's observations. Broome ordered the undercover agent to step out of the car. Bailey and Broome then searched the car and the agent. Bailey even ordered the agent to drop his pants during the search. Bailey recovered $1,200 in cash from the car and jacket pocket of the agent. Bailey handed the money to Jones who monitored the search from inside the animal control van. Jones took approximately $500 of the money before he

returned it to Bailey. When the search was completed the three men left the area and went to another location to divide up the money. Bailey is heard on the tape as he counted the money.

With regard to his possession of a firearm, at trial Bailey disputed whether he carried a firearm that day. To prove up defendant's firearm possession, in addition to the video tape, the photographs and agent's testimony, the government offered the testimony of Charles Jones, Michael Broome and defendant's girlfriend.

More specifically, Broome testified he saw Bailey with the firearm on January 25 and that Bailey always carried this firearm in his belt just behind his pocket on his right side. Broome described the firearm as a .25 caliber semi-automatic. On a prior occasion, Bailey told him that the gun belonged to his father. During the January 16, 1995 tape recorded conversation, Broome and Bailey talked about Bailey's possession of the gun on two separate occasions. On one occasion, while the two men were just outside of a fast food restaurant, Bailey pulled the gun out. Broome stated to Bailey, "Man you gonna shoot yourself with that little raggedy assed pistol. Look at that nasty assed .25." Later in the same conversation, while the two men were outside in the park district police station parking lot, Bailey stated, "I could've shot that motherfuckin' squirrel." Broome responded, "you better put that little gun up before the Chief sees it. You ain't gon never, never get no badge. You ain't got but one more month man. Don't fuck

around. Don't shoot me man. Don't shoot."[1]

Jones also recalled that Bailey always carried a .25 caliber firearm in the belt of his pants, in the exact location described by Broome and while on duty. Bailey also told Jones that the firearm belonged to his father.

The government introduced additional evidence of defendant's possession of the firearm approximately two months after the offense charged. Specifically, defendant's girlfriend testified that in March 1996 she saw defendant in possession of a firearm similar to the firearm observed by Jones and Broome. The specific information regarding the events that lead up to her observation of the gun were not provided to the jury but are as follows. On March 22, Collier went to defendant's home on her lunch hour. Defendatn lived at the home with his mother and father. She went there to tell defendant that she had traded in his motorcycle, which was in her name and on which she was making all the loan and insurance payments, for a car for herself. Part of the conversation took place in the family room of defendant's home.

Collier's disclosure to defendant caused an argument which lead to defendant's refusal to allow Collier to leave the home. Defendant tried to handcuff Collier and managed to get a cuff on one of her wrists. He then fired one shot from what she recalled was a small black gun. Collier felt the heat from the bullet as

---

[1] Defendant had to be at least 21 years old in order to carry a firearm and become a law enforcement officer. Defendant was 20 years old at the time of this conversation. His 21st birthday was on February 3.

7

it passed her left ear. Collier left the residence and walked down to a church where Bailey's father was the pastor. She went there to find defendant's mother. After reaching the church, Collier located defendant's mother and told her what happened. Defendant's mother accompanied Collier back to the house where she got the key to the handcuffs from defendant to remove the cuff from Collier's wrist. Collier later reported the incident to the Maywood Police Department.

In February 1997, defendant was interviewed at his residence by two law enforcement officers. During the interview, defendant acknowledged his participation in the shakedown of the undercover agent with Jones and Broome. He stated that he used his share of the money to make a car loan payment. (Interview Statement Attached).

III. <u>SENTENCING GUIDELINE CALCULATIONS</u>

Pursuant to Guideline Section 2B3.1, the base offense level for the offense is level 20. The offense level is increased 2 levels pursuant to Guideline Section 2B3.1(b)(4)(B) because a person, the undercover agent, was physically restrained to facilitate the commission of the offense. The offense level is increased 5 levels pursuant to Guideline Section 2B3.1(b)(2)(C) because a firearm was possessed. Pursuant to Guideline Section 3B1.3, the offense level is increased an additional 2 levels because defendant abused a position of public trust.

Based on information available to the government, defendant has no prior criminal history and his criminal history category is

8